**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CARRIE JONES,**
                    **Plaintiff,**

**-vs-**                                            **Case No. 6:04-cv-540-Orl-31KRS**

**SCHOOL BOARD OF ORANGE**
**COUNTY, FLORIDA,**
                    **Defendant.**

_____

**ORDER**

This case is before the Court on Defendant School Board of Orange County, Florida's Motion for Summary Judgment (Doc. 40) and Plaintiff Carrie Jones's Response (Doc. 49) thereto.

**I.    BACKGROUND**

This case relates to Jones's employment in the School Board system. Jones took the position of bookkeeper at Stonewall Jackson Middle School ("Stonewall") on July 31, 2001. In that position, Jones was responsible for maintaining and, in certain instances, generating financial documents in the course of Stonewall's operations. Jones's position put her in contact with individuals and organizations on Stonewall's campus as well as with officials in various off-campus School Board departments. For a time in her tenure, Jones was president of the Parent Teacher Student Association ("PTSA") at Stonewall and, in that capacity, maintained the PTSA's finances. Jones eventually resigned her PTSA presidency and later, on June 28, 2003, her position as Stonewall's bookkeeper. Jones was dissatisfied with the state of things and wanted to accept a job offer at another school within the School Board system. Circumstances, however, led to the revocation of that job offer and, in turn, the filing of this case.

### A. Stonewall's Finances and Internal Accounting

During Jones's two-year tenure, Stonewall's accounts and records were kept in a manner inconsistent with School Board policy and general accounting standards. The PTSA's accounts and records apparently shared that state. According to Jones, she was hired without having bookkeeping experience, did not receive the School Board's accounting policies manual until nearly the end of her tenure, and received improper directions on how to maintain and handle Stonewall's and the PTSA's financial accounts. For the most part, Jones credits Carlotta Iglesias, Stonewall's Principal, as the person responsible for the state of Stonewall's and the PTSA's internal finances during Jones's tenure.

As Stonewall's bookkeeper, Jones maintained the school's only bank account; she handled the monthly statements, made the deposits, and prepared checks for that account. Jones also maintained Stonewall's various internal bookkeeping accounts, such as a "petty cash" account, the Young Marines' account, etc. And, for about two months in her first year at Stonewall, Jones also handled aspects of the payroll system. In day-to-day operations, school officials would give Jones receipts for reimbursement, money collected for certain things (with or without appropriate monies-collected forms), and various financial documents. Jones was to keep files, make bookkeeping entries in the internal accounts, arrange payments, and deposit funds into Stonewall's bank account or forward funds to the School Board, as appropriate.

In the course of handling the influx and outflow of money associated with the activities and purchases of school officials, Jones says she handled various transactions at Principal Iglesias' direction. Jones transferred funds from the PTSA's bank account to Stonewall's bank account on certain occasions. Into Stonewall's bank account, Jones also deposited funds received from the

School Board as well as money she received from certain school organizations or ventures.[1]  Jones would issue checks from the Stonewall bank account for various things.  Under the bookkeeping system Jones handled, numerous checks apparently were drawn for what were characterized as "petty cash" expenditures.  This, of course, drew down Stonewall's bank account.

Over time in Jones's tenure, a widening discrepancy occurred in Stonewall's finances and internal accounting.  The amounts drawn against the "petty cash" account exceeded the amounts earmarked for that account in the internal bookkeeping, and reimbursements from the School Board were not being requested or received at a rate to keep up with "petty cash" expenditures.  Among Stonewall's various internal bookkeeping accounts, Jones kept a running tally (in some fashion) of amounts that were taken into the "petty cash" account from accounts earmarked for specific school organizations or ventures.  Jones says she also frequently used her own money to pay for items and later requested reimbursement from "petty cash."  In regard to the 2002-2003 school year, for instance, Jones has provided the following take on Stonewall's finances and, with that, a window into Stonewall's internal accounting:

> Throughout the year, [Principal] Iglesias would spend a lot of money for banquets and parties.  She directed me to borrow money from the yearbook, Young Marines, PTSA and other accounts to pay for these items.  At the end of the year, Ms. Iglesias also wanted to reimburse herself, Ms. Burgess and me for over $1,500 that we had personally spent over the course of the year on food, gifts, flowers etc. . . . After we were reimbursed, there was not enough money left to pay for the year book, reimburse Young Marines for $1,061.00 of their funds used to pay Scholastic Books, Inc. for a scholastic book fair, and pay an invoice of $1,500.00 from Darnell Company for candy purchased for a student government fund raiser.  Iglesias then told me to request from the District a reimbursement to our petty cash fund in the amount of nearly $6,000 so that these items could be paid.

---

[1] Stonewall apparently generated money from the sale of uniforms, and school organizations would have fundraisers and gather donations that would be deposited into Stonewall's bank account.

(Doc. ¶7). Assuming that is true, school funds might have been misspent, the internal accounting was clearly problematic, and there was a growing shortfall in Stonewall's bank account during the 2002-2003 school year.

**B.     Stonewall's Organizational Relations**

Stonewall is one of many schools in the School Board system, and Stonewall's officials, like those of other schools, interact with centralized School Board departments in regard to certain issues. The School Board administration includes, among other departments, an Internal Accounts Department, an Accounts Payable Department, an Employee Relations Department, and an Internal Audit Department, each with certain delineated functions. In the course of Jones's tenure, Jones and other Stonewall officials interacted at various times with these departments to address financial and other issues.

Toward the beginning of her tenure, Jones received training from the Internal Accounts Department on the Manatee system, an accounting database system. Other than providing such training, the Internal Accounts Department was available to answer the day-to-day questions of bookkeepers. That department also prepared the School Board's accounting manual. Nevertheless, Jones apparently relied on Principal Iglesias's secretary, Valerie Burgess, as a main resource at least on the Manatee system, and Jones says she did not receive the School Board's accounting manual until her last month at Stonewall. Jones did, however, contact the Internal Accounts Department at times.

The Accounts Payable Department was the contact point for payment and reimbursement issues. Jones would submit receipts along with the monthly statements for the school's official credit cards ("P cards") to the Accounts Payable Department for processing. That department also

processed requests for reimbursement. Jones submitted certain requests for reimbursement for what were considered "petty cash" expenditures under the bookkeeping system she handled.

The Employee Relations Department performed several functions. Among other things, it was a contact point for employment issues, it conducted disciplinary investigations, and it investigated complaints. Jones recalls contacting that department in February 2003 to ask about receiving mileage reimbursements for her work-related errands. The bulk of Stonewall's relevant contacts with that department, however, appear to have occurred near the end of Jones tenure and after she resigned. In that time frame, officials in the Employee Relations Department were involved in investigating and handling several complaints to which Jones was a party.

Finally, the Internal Audit Department is charged with, among other duties, performing operations audits at the request of school principals. Such audits involve testing whether a school is utilizing proper accounting procedures and internal controls. At Principal Iglesias's request, the Internal Audit Department performed an operations audit at Stonewall, which started about one month before and lasted until after Jones resigned from her position.

### C. The Stonewall Audit

According to Principal Iglesias, she became concerned near the end of the 2002-2003 school year about apparent bookkeeping inconsistencies and certain requests for reimbursement Jones had prepared. Principal Iglesias asked Mike Smith, an auditor in the Internal Audit Department, to perform an unannounced operations audit at Stonewall. Auditor Smith performed a preliminary audit for April and May 2003. This entailed him reviewing Stonewall's records and meeting with Jones to discuss her bookkeeping and monetary transactions procedures. The preliminary audit indicated that Jones was not following the proper procedures.

Among other things, the preliminary audit indicated the following deficiencies: (1) Jones was receiving cash deposits for school officials in a manner not subject to appropriate verification; (2) Jones did not have verified receipts for bank deposits; (3) Jones apparently held $5,300 for several days before depositing it, when amounts greater than $200 should be bank deposited the same day; (4) Jones was apparently commingling internal accounts; (5) Stonewall had both a "petty cash" account as well as P cards, and Stonewall should discontinue the "petty cash" account; (6) Jones had petty cash receipts over a year old that had not been submitted for reimbursement; and (7) Jones had kept documents in a disorderly fashion.

On June 26, 2003, Dwain Rivers, a manager in the Employee Relations Department, sent Jones a letter asking her to attend a meeting, scheduled for July 1, 2003, to discuss alleged misconduct on her part. Relations Manager Rivers attended the meeting as did Auditor Smith, Principal Iglesias, and Jones along with Lee Littlefield, a representative from her union. During the meeting, they reviewed and discussed the preliminary audit report. Jones recalls being told essentially that the meeting was troubleshooting, not disciplinary, in nature, and they were going to figure out how to fix things for the future. Evidently, various aspects of Jones's job performance and Stonewall's activities were discussed. And whether from information in the meeting or otherwise, Jones understood at that time that the operations audit would continue.

Jones took a pre-arranged vacation in the first half of July 2003 and returned to Stonewall on July 14th. Jones recalls that she worked very hard that week to get Stonewall's records in order but fell ill with a case of stress-induced hives that kept her out of the office after July 17, 2003. July 17th was her last day at Stonewall. She submitted her resignation on July 28, 2003, while still

out on sick leave. Jones recalls that before she left Stonewall, however, everything was in order except a single file that contained recent bills that had not yet been properly filed.

The Internal Audit Department ultimately determined that the preliminary audit findings were essentially accurate. A verifiable paper trail was lacking. For most part, receipts did not exist or were not available to trace and verify the collection of sums certain by school officials in the course of various school activities, the transfer of the sums certain to Jones, and the deposit of the sums certain into Stonewall's bank account. Jones did not follow a receipting procedure that would produce such a paper trial. Furthermore, according to Linda Lindsay, the senior director of the Internal Audit Department, Stonewall's internal bookkeeping accounts were commingled, such that the auditors could not determine if or where funds were missing in regard to separate school organizations or activities. When asked whether Jones embezzled school funds, Audit Director Lindsey put it this way: "I determined that funds were raised for the school and could not be accounted for in the school books and records. What happened to them, I don't know." (Doc. 41-4, at 32). After the audit, the Internal Audit Department issued a final report on August 12, 2003. Given what the auditors observed of Stonewall's overall bookkeeping and various school officials' claims, the auditors concluded that Stonewall's fiscal condition was at very high risk.

### D. Jones's Selection and Characterization of Events and Complaints

Jones claims that at points in her tenure she raised concerns about Stonewall's spending and accounting practices with Stonewall officials and the above-referenced departments. Jones explains that she started having disputes with Principal Iglesias early in 2002, when the principal announced a plan to reward students with gift certificates if they attained certain scores on a standardized test – the FCAT. Jones recalls telling Principal Iglesias that Stonewall did not have

enough money to fund that plan. Jones points to February 2003, however, as the substantial beginning of a course of events in which she spoke out on issues of public concern – school spending – and which culminated in two television broadcasts on July 27 and 29, 2003. Jones credits her speech, which she claims is protected under the First Amendment, as the reason School Board officials prevented her from starting a job at another school in the School Board system.

The following are what Jones describes as the speech that caused her job loss:

- [O]n February 5, 2003 . . . I called [the Employee Relations Department] to see if I had a right to mileage reimbursement for the almost daily errands I made in my personal vehicle. I told [Relations Manager] Rivers that I did not want [Relations Manager] Alfred Lopez to investigate the issue because [Principal] Iglesias had often bought him lunch with District funds. (Doc. 49-2, ¶5).

- On March 27, 2003, Marilyn Purdom of [the Internal Accounts Department] called me to ask why the school was paying so much to Cingular Wireless.*** I told her that [Secretary] Burgess and [Principal] Iglesias were not paying for their personal calls. (*Id.* ¶6).

- In mid-June, I spoke to Franny Crittendon at [the Accounts Payable Department] about a [nearly $6,000] request for reimbursement. I told Crittendon that I was concerned that I was being told to use my own money for flowers, food, and gifts. I explained to Crittendon that [Stonewall] had also borrowed from the yearbook, Young Marines, and other internal accounts to pay for food and gifts that had to be paid back. She told me to come downtown and show her what I had to see what could be done about it. [Whereupon the head official of that department, according to Jones, discussed proper petty cash use and reimbursement procedures, and the official indicated that Stonewall was not in compliance]. (*Id*. ¶8)

- On July 1, 2003, when I met with [Relations Manager] Rivers, [Relations Manager] Lopez, [Auditor] Smith and [Principal] Iglesias for a troubleshooting meeting, I raised many concerns about the excessive cell phone bills, the FCAT rewards, the payment of substitute[] [teachers] without teaching certificates at a teacher's rate of pay, sending [a Stonewall official] to attend the tech coordinator's conference in Las Vegas, and being required to by [sic] food or gifts with my own funds because the school was not allowed to use its purchasing card for such items. I used the meeting as an opportunity to raise all of the spending concerns that I'd had throughout the year. (*Id.* ¶11).

- [Upon returning from vacation] on July 14, 2003, I received a directive over bookkeeping procedures.*** [O]n the same day, [Principal] Iglesias hollered and screamed at me. She accused me of trying to get her fired and blamed me for going to the school board

      concerning the petty cash reimbursement.  I went to my union representative, Michelle Vanderlay, and asked her to file a hostile work environment complaint on my behalf, which she did [on July 21, 2004].  [Thereafter, Jones points out that the hostile work environment complaint included references to financial misconduct at Stonewall].  (*Id*. ¶12).

•    On July 27, [television station] WFTV ran the first broadcast on the FCAT.  On July 29, it ran the second broadcast.  I was the person who alerted the station to the issue and provided much of the information for its initial broadcast.  I was disturbed that the school had promised one amount to students before they took the test and then changed the amount and also concerned that an entire group of students never got their gift certificates.  (*Id*. ¶14).

### E.  Job Offer Revocation and the Instant Case

At some point before July 2003, Jones applied for a paraprofessional position at Freedom High School.  She later interviewed with Freedom High's principal, Carl Colton, and received a job offer shortly before the end of July.  Via email, Jones resigned her position at Stonewall on July 28th in favor of the new job offer.  At about the same time, however, Relations Manager Lopez called Principal Colton.  According to Lopez, he informed Principal Colton of the pending audit into Stonewall's finances and internal accounting, explained that Jones was not cooperating with the audit, and indicated that it would be a little bit illogical to take her on at a new school under the circumstances.  Principal Colton thereafter contacted Jones on July 30th to revoke the offer for her to work at Freedom High.

Based on the foregoing events, Jones filed the instant case on April 16, 2004.  Jones asserts the following two claims: that (1) the School Board retaliated against her in violation of her First Amendment rights and (2) the School Board violated Florida's Whistlebower Act, FLA. STAT. § 112.3187 *et seq*.  After extensive discovery, the School Board has filed the Motion for Summary Judgment that is now before the Court.

**II.     STANDARD OF REVIEW**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Whether a fact is material depends on the substantive law of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  If there is an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof, that party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Summary judgment is mandated against the nonmoving party who thereafter fails to present sufficient evidence to establish a genuine issue of fact for trial. *Id.* at 322, 324-25.

In this review, the Court must consider all inferences drawn from the underlying facts in a light most favorable to the nonmoving party, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.  If a material issue of fact exists, the court must not decide it, but rather, must deny summary judgment and proceed to trial. *Environmental Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[2]  But "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

---

[2]Unless reversed, decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

### III.     LEGAL ANALYSIS

Jones claims, in essence, that she engaged in certain instances of speech protected under federal and state law, and the School Board unlawfully retaliated against her because of the speech. As the School Board disputes and points to a lack of evidence to support those claims, at issue is whether Jones has engaged in protected speech and whether she has raised a material issue of fact as to the cause of her job loss.

#### A.     The First Amendment Retaliation Claim

State employees cannot be denied state employment merely for engaging in speech protected under the First Amendment. *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000). State employees do not, however, enjoy an absolute right to expression. *Maggio v. Sipple*, 211 F.3d 1346, 1351 (11th Cir. 2000). A four-step inquiry applies if a state employee claims to have suffered retaliation for expression protected under the First Amendment. *Stanley*, 219 F.3d at 1288. To establish at the outset whether expression is protected, the employee must show, first, that the expression is "fairly characterized as constituting speech on a matter of public concern," and, second, that the employee's interest in expression outweighs the employer's interest in promoting the efficient performance of public services. *Maggio*, 211 F.3d at 1351 (citing and quoting *Connick v. Myers*, 461 U.S. 138, 142, 146 (1983)). If the speech at issue was protected, the employee must show, third, that the speech "played a 'substantial part' in the employer's decision" to deny the employee's employment. *Stanley*, 219 F.3d at 1288. Fourth and finally, the preceding factors are overcome, if the employer establishes by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." *Id*. (citations omitted).

### 1.     The Nature of Jones's Speech

Jones characterizes several instances during her tenure at Stonewall as involving speech on matters of public concern.  In that regard, whether Jones has accurately characterized those instances must be determined by the content, form, and context of her statements as revealed by the record as a whole.  *Connick*, 461 U.S. at 147-48.  The content, form, and context of her statements are matters for Jones to establish.  *Maggio*, 211 F.3d at 1351.  And it is a question of law, not fact, whether Jones's statements may be "fairly characterized as constituting speech on a matter of public concern."  *Id.*

As to content, the speech must relate to any matter of political, social, or other concern to the community.  *Id.* at 1351-52.  And, as to form and context, "[i]f the . . . employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  *Id.* (quoting *Connick*, 461 U.S. 147) (internal quotation marks omitted).  From a policy standpoint,

> [t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case.  While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. 149.  Accordingly, this Court must discern whether Jones spoke primarily as a citizen on behalf of the public or primarily as an employee upon matters of personal interest.  *Maggio*, 211 F.3d at 1352.  "[B]ecause an employee's speech will rarely be entirely private or

entirely public, the main thrust of the employee's speech must be determined." *Id.* (citations and internal quotation marks omitted).

In her bid to establish that she spoke on matters of public concern, Jones relies heavily on the proposition that waste and misspending of public monies is a matter of deep public concern. Yet, with the exception of leaking information to a television station, Jones has failed to establish a primarily public thrust in the form and context of her speech. In this regard, Jones's characterization of events cannot make up for a lack of evidence. Jones claims, for instance, that she used the July 1, 2003 audit, disciplinary, or troubleshooting meeting "as an opportunity to raise all of the spending concerns that [she] had throughout the year." (Doc. 49-2, ¶ 11). Even if such issues were clearly raised in that meeting, however, the meeting was spurred by obvious problems in Stonewall's finances and internal accounting. Most likely, in the internal-office context in which the meeting arose, Jones was trying (at best) to clear up problems with the bookkeeping system she maintained or (at worst) to shift blame onto others. Furthermore, Jones's other references to inter-office speech involve ambiguous exchanges mostly with people in School Board departments that Jones would contact in the normal course of business.[3] Apart from conclusory allegations, Jones has not presented evidence of circumstances to reveal that, in those instances, she was speaking primarily as a citizen on behalf of the public.

---

[3]Jones's Hostile Work Environment claim, dated July 21, 2003, is somewhat different from the other speech she cites, in that it was written and apparently not produced in the normal course of business. Nevertheless, the evident purpose the claim was to explain her involvement in intra-office disputes, lay blame on Principal Iglesias, and obtain some relief from Principal Iglesias's alleged conduct. The form and context of the claim does not indicate that she was speaking primarily as a citizen on behalf of the public.

Jones's leak of information to a television station does, however, appear to constitute speech on a matter of public concern. The issue that follows is whether Jones has shown that the speech played a "substantial part" in the revocation of the job offer she received from Principal Colton. *Stanley*, 219 F.3d at 1288.

### 2. Jones's Speech and the Job Offer Revocation

Jones apparently relies on close temporal proximity as proof that her speech was the reason for the job offer revocation. In that regard, Jones must establish that the job offer was revoked by one who had the necessary retaliatory intent. A government official's intent is a critical element with regard to a First Amendment retaliation claim. *Walker v. Schwalbe*, 112 F.3d 1127, 1133 (11th Cir. 1997) (finding state of mind a critical element in determining whether qualified immunity applied to First Amendment retaliatory demotion claim). Retaliation requires actual knowledge and real intent, not merely constructive knowledge and assumed intent. *See Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001).

By all accounts, Principal Colton was the person who decided to revoke his offer to employ Jones at Freedom High.[4] Although it is not clear that Relations Manager Lopez knew Jones was the one who leaked the information for the July 27, 2003 television broadcast, assuming he did know, Jones has not presented any evidence that Principal Colton shared that knowledge or was even aware of the television broadcast. Principal Colton does not appear to have been privy to any

---

[4] Jones credits Principal Iglesias's decisions and failure properly to manage the personnel at Stonewall for the state of the school's finances and internal accounting. Fundamental to her theory is that principals are ultimately responsible for school personnel. Audit Director Lindsey, furthermore, confirmed that "ultimately, the principal oversees all of the staff at the school." (Doc. 41-2, at 31). Principal Colton gave Jones the job offer at issue, and there is nothing in the record to indicate that someone else made the decision to revoke that job offer.

information other than a call from Relations Manager Lopez on July 28, 2003, indicating that an audit, in which Jones was not participating, was under way at Stonewall.[5] While Jones disputes the truth of the information Lopez reported – arguing, in contrast, that she was ready, willing, and able to assist in the audit – the record indicates that after the preliminary audit and related-July 1, 2003 meeting, Jones was present at Stonewall only for about four days, she spent that time trying to organize files, she resigned on July 28th, and there is no evidence that she expressed a willingness to be contacted when absent. Moreover, the specter of a problematic audit, indicating that verified records were both missing and never made, would provide more than adequate ground for Principal Colton's decision.[6] Without presenting some probative evidence, Jones has failed to established that her information leak played a "substantial part" in Principal Colton's decision to revoke the job offer he gave her.[7]

### B.   The Florida Whistleblower Claim

Jones's claim under the Florida Whistleblower Act follows a similar analysis to her First Amendment claim. A prima facie claim under the Florida statute borrows its basic elements from federal-law claims of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

---

[5]To be sure, in theory, a person harboring retaliatory intent could improperly influence an unwitting final decisionmaker and, in doing so, render the final decision retaliatory. In this case, however, no protected expression on Jones's part caused the audit. Furthermore, the uncontradicted evidence of what Lopez told Principal Colton does not raise any inference that Principal Colton was misled.

[6]Regardless of Jones's claim that she could have explain how she accounted for things, proper accounting is not a matter of trust. It involves procedures, documentation, and internal controls to verify the completeness and accuracy of transactions. Without adherence to such safeguards, embezzlement and other fiscal risks can easily occur without notice and perhaps recourse.

[7]Jones has not presented evidence that she applied for or was denied any other position.

*et seq.*: in essence, "a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Rice-Lamar v. City of Fort Lauderdale*, 853 So.2d 1125, 1132 (Fla. 4th DCA 2003).

Protected expression under the Whistleblower Act includes, in relevant part, information:

- disclosing – "[a]ny act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds . . . or gross neglect of duty committed by an employee . . . ," FLA. STAT. § 112.3187(5)(b);

- disclosed to – "a chief executive officer . . . defined [as "the person . . . who is responsible to the legislative body of the public employer for the administration of . . . the public employer] or other appropriate official," *id*. § 112.3187(6) (internally referencing FLA. STAT. § 447.203(9)); and

- disclosed by – "employees . . . on their own initiative in a written and signed complaint; who are requested to participate in an investigation, hearing or other inquiry conducted by any agency . . . or employees who file any written complaint to their supervisory officials," *id*. § 112.3187(7).

These provisions and the Whistleblower Act, in general, are to be given a liberal construction. *See Irven v. Department of Health and Rehab. Servs.*, 790 So.2d 403, 405 (Fla. 2001).

In the instant case, it is not disputed that Jones suffered an adverse employment action. Rather, the School District disputes whether Jones engaged in protected expression or has raised a triable issue of causation as between some expression and the job offer revocation.[8] The Court

---

[8]One argument to the contrary that cannot go without at least a passing comment is Jones's theory that a so-called "whistleblower complaint" she filed with the School Board Superintendent on

perceives a difficult issue at least in regard to whether Jones engaged in protected expression at the July 1, 2003 audit, disciplinary, or troubleshooting meeting.  That meeting may have been an "inquiry" within the meaning of the Whistleblower Act, but Jones's conclusory description of her comments at that meeting leaves considerable doubt whether she identified conduct as being an "act or suspected act of gross mismanagement, etc."  Without more clear direction, the Court is reluctant to treat the Whistleblower Act as coextensive in that regard with the First Amendment claims analysis.  In the end, however, the Court need not decide that issue.

Jones's Whistleblower-Act claim fails for another reason previously discussed.  Principal Colton was not present at the July 1, 2003 audit, disciplinary, or troubleshooting meeting, nor has Jones presented any evidence he was aware of protected expression on her part.  As the Whistleblower Act and Title VII follow the same basic elements, *Rice-Lamar*, 853 So.2d at 1132, it is clear that actual retaliatory intent and, therein, knowledge comprise a necessary element of Jones's Whistleblower-Act claim, *see Silvera*, 244 F.3d at 1262.  As previously discussed, Jones has failed to present a triable issue of fact on that dispositive element.

**IV.  CONCLUSION**

For the foregoing reasons, it is

---

October 1, 2003 constituted relevant protected expression.  Jones acknowledges that the alleged retaliation at issue preceded that complaint.  Under a most liberal construction of the Whistleblower Act, causation remains a necessary factor, and Jones's theory in that regard is absurd.

**ORDERED** that Defendant School Board's Motion for Summary Judgment (Doc. 40) is **GRANTED**.  All other pending motions are denied as moot, and this case is removed from the October 2005 trial docket.  The Clerk is directed to enter judgment in favor of the School Board and close this case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 20, 2005.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record